[Cite as *Smoyer v. Smoyer*, 2019-Ohio-3461.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| William E. Smoyer, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 18AP-365 |
| v. | : | (C.P.C. No. 16DR-1168) |
| Chloe R. Smoyer, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on August 27, 2019

**On brief:** *Isaac Wiles Burkholder & Teetor, LLC,* and *Joanne S. Beasy* and *Dale D. Cook*, for appellant. **Argued:** *Joanne S. Beasy.*

**On brief:***,* *Grossman Law Offices*, and *Anthony R. Auten*, and *John H. Cousins, IV*, for appellee. **Argued:** *John H. Cousins, IV.*

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

BEATTY BLUNT, J.

{¶ 1} Plaintiff-appellant William E. Smoyer appeals the April 26, 2018 decision and judgment entry - decree of divorce ("decree") of the Franklin County Court of Common Pleas, Division of Domestic Relations. After reviewing the record and relevant law, we affirm in part and reverse in part the trial court's decision.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} William Smoyer and defendant-appellee Chloe R. Smoyer were married on May 30, 1992. During their marriage, the parties had three children together, C.S., J.S., and P.S. The youngest child was emancipated on September 29, 2016. On March 22, 2016, William filed a complaint for divorce on the grounds of incompatibility.

{¶ 3}   In the course of the proceedings, the parties agreed to certain stipulations, which they filed with the trial court on November 6, 2017.  They agreed that the stipulations should be "incorporated into the Court's Judgment Entry – Decree of Divorce."  (Nov. 6, 2017 Stipulations.)  Attached to the stipulations was a "balance sheet" that listed the parties' assets, the date of valuation of the assets, and the stipulated fair market value for most of the assets.

{¶ 4}   The parties did not stipulate to the fair market value of several assets, including business interests in Investment Builders of Florida, Ltd. ("IBF, Ltd.") and Investment Builders of Florida, Inc. ("IBF, Inc.").  The parties also could not resolve issues relating to spousal support and the division of certain marital property.

{¶ 5}   A trial was held to resolve these remaining issues on November 6, 7, 8, 9, 27, 28 and December 4, 2017.

### A.  Division of Marital Assets

{¶ 6}   IBF, Ltd. and IBF, Inc. are family-owned businesses, started by William's father, which invest in securities and real estate.  William acquired interests in both companies before the marriage, and the parties acquired interests in both companies during the marriage.  The parties do not dispute the number of shares that comprise William's separate property versus those that are marital property.  The parties dispute only the value of the shares that are marital property and subject to division.

{¶ 7}   William's sister, who now runs both businesses, testified that IBF, Ltd. has a present total value of $1,193,658.  She testified that IBF, Inc. has a present total value of $584,734.  Those valuations were not contested.  The parties combined marital and separate interest in IBF, Ltd. is 40 percent of the business.  The parties do not dispute that the marital interest in IBF, Ltd. totals 13.075 percent of the business.  The remainder, approximately 26.925 percent, is William's separate interest in IBF, Ltd.  There are 200 shares total in IBF, Inc., of which the parties own 30 shares as marital assets.  William owns 50 shares in IBF, Inc. as separate property, acquired before the marriage.

{¶ 8}   The parties both hired experts to testify regarding the valuation of the marital interests in IBF, Ltd. and IBF, Inc.

{¶ 9}   William's accounting expert, Gary Moll, testified that the marital interests in the two businesses should be the amount of martial funds used to acquire the shares with

some amount allowed for appreciation, a cost-based approach. For IBF, Ltd., the parties paid $30,150 to acquire a 13.075 percent marital interest in the business from William's mother. Moll opined that the value of the marital interest in that business was $37,227.

{¶ 10} The parties paid $11,500 to acquire 25 shares in IBF, Inc. from two family members. Allowing for some passive appreciation, Moll attributed a total value of $15,940 to the marital shares in IBF, Inc.

{¶ 11} Chloe's accounting expert, Dana Lavelle, used a value-based approach to determine that the 13.075 percent marital interest in IBF, Ltd. is worth $156,071. Under this approach, he took the total present value of IBF, Ltd. and multiplied that number by the percentage comprising the marital property to arrive at his valuation. For IBF, Inc., Lavelle used the same approach to arrive at marital interest of $87,710.

### B. Spousal Support

{¶ 12} William is a pediatric nephrologist. At the time of their marriage, Chloe was a nurse practitioner, working in cardiology. William's approximate total yearly income is $371,538. Chloe left the workforce when the parties' first child was born in 1995. She has never returned to the workforce, and she was not employed at the time of the divorce. Chloe has never been licensed as a nurse in Ohio, and her former license lapsed in 2008.

{¶ 13} The parties' middle child, J.S., has Down syndrome and is autistic. The parties dispute the amount of care he requires and will continue to require in the future, as well as the impact his care needs have on Chloe's ability to work outside the home.

{¶ 14} At the trial, William's expert, Bruce Growick, Ph.D., testified that Chloe could easily become employed full time as a medical assistant with her current skill set. In that role, she could expect to earn $38,000 per year. With additional retraining and recertification, she could earn $65,000 as a registered nurse or $82,000 as a nurse practitioner.

{¶ 15} Chloe testified that she cannot reenter the work force in any capacity because J.S. requires significant ongoing care. She is his primary caregiver. The parties testified that J.S. is expected the graduate from high school soon and will qualify for full-time adult daycare.

## C. The Court's Decree

{¶ 16} On April 26, 2018, the trial court issued its decree, granting the parties a divorce and resolving pending issues.

{¶ 17} As to marital assets, and relevant to this appeal, the trial court found that the parties acquired their interest in IBF, Ltd. "by purchase, as well as gift."  (Decree at 8.) Because the acquisition was intrafamilial and occurred 11 years prior to the divorce, the trial court determined that Lavelle's value-based approach provided a more accurate valuation. (Decree at 7.) According to the trial court, a cost-based approach would be more appropriate if the transaction was an "arm's length" transaction made near the time of the divorce proceedings.  (Decree at 7.) Accordingly, the trial court attributed a value of $156,071 to the 13.075 percent marital interest in IBF, Ltd.  Applying the same methodology, the court attributed a marital interest value of $87,710 for IBF, Inc.

{¶ 18} Regarding spousal support, the trial court conducted an analysis pursuant to R.C. 3105.18.  The court considered Chloe's age and health, the length of the marriage, Chloe's present employability, the labor market, the ease of obtaining licensure as a registered nurse or nurse practitioner again, and the length of time Chloe has been unemployed.  Despite Chloe's contention that her obligations to care for James prevent her from working at all, the court found that Chloe could obtain full time employment.  (Decree at 21.)  But the court expressed concern about Chloe's ability to become licensed as a nurse practitioner again.  (Decree at 21.)  The trial court imputed to Chloe an annual income of $38,000 per year as a medical assistant.  (Decree at 21.)   The court then ordered William to pay spousal support in the amount of $11,000 per month.  The trial court noted that its order "shall be indeterminant [sic] subject to the Court's ongoing jurisdiction," and the court specifically "retain[ed] jurisdiction for modification of this provision." (Decree at 19, 21.)

{¶ 19} Attached to the decree is a spreadsheet, Exhibit 1, of the parties' assets.  It reflects the fair market value of the assets, the court's determination regarding which assets are separate versus marital, the value of the marital assets, and the "proposed" division of the marital assets.

{¶ 20} William appeals the trial court's decree.  He argues that the trial court failed to divide all marital assets.  He disputes the trial court's valuation of the parties' marital

interests in IBF, Inc. and IBF, Ltd.  He contends that the trial court should have imputed more income to Chloe, thereby reducing the amount of spousal support she is owed.  And he argues that the court failed to require that ongoing costs be shared equally between the parties.

### D.  February 21, 2019 Agreed Entry

{¶ 21}  After the trial court issued the decree, after William filed his notice of appeal, and shortly before the oral argument on this case, the parties submitted an agreed entry to the trial court.[1]  (*See* Franklin C. P. No. 16DR-1168, Feb. 21, 2019 Ex. A to Agreed Entry.) The parties addressed several accounts named after two of their children, and the trial court signed the entry.  In the entry, the parties agreed as follows:

> 6. On or before February 28, 2019, Plaintiff shall transfer into [C.S.]'s 529 Account the funds held in the [C.S.] Graduation/Education Account#7227.  Once the transfer is complete, and within 14 days of the same, Plaintiff shall then transfer ownership of the [C.S.] 529 Account to Defendant, which Defendant shall keep as her sole property free and clear of any claim of Plaintiff, and Defendant shall hold Plaintiff harmless on the same.  This is a final property division of these accounts.
>
> 7. Plaintiff shall keep the [P.S.] Graduation/Education Account #0394 and the [P.S.] 529 Account free and clear of any claim of Defendant, and Plaintiff shall hold Defendant harmless on the same.  This is a final property division of these accounts.

*Id.*

## II. ASSIGNMENTS OF ERROR

{¶ 22}  In his appeal, William presents the following assignments of error for our review:

> 1. The trial court erred in failing to address all the parties' assets and debts and/or the allocation of the same in the decision and judgment entry decree of divorce.

---

[1] Although the agreed entry was not made a part of this court's record because it was filed after the date the record was filed, this court takes judicial notice of the February 21, 2019 Agreed Entry as it is reflected on the trial court's electronic docket.  An appellate court may take judicial notice of prior proceedings in the same case and the docket of the lower court's case.  *See Stancourt v. Worthington City School Dist. Bd. of Edn.*, 164 Ohio App.3d 184, 2005-Ohio-5702, ¶ 14 (10th Dist.), fn. 3; *Pollard v. Elber*, 6th Dist. No. E-17-050, 2018-Ohio-4538, ¶ 14-15.

2. The trial court abused its discretion in its calculation of the value of the marital interest in Investment Builders of Florida, Ltd. and Investment Builders of Florida, Inc.

3. The trial court abused its discretion in ordering that only "losses" after July 19, 2017 would reduce each party's share of marital accounts.

4. The trial court abused its discretion in awarding $11,000 per month in spousal support, in failing to impute appropriate income to Mrs. Smoyer, and by improperly limiting the changes in circumstances that would justify a modification of spousal support.

## III.  LAW AND ANALYSIS

### A.  The trial court erred in failing to address and allocate all of the parties' assets (Assignment of Error 1).

{¶ 23}  William argues that the trial court's decree "did not address or fully address" certain marital assets, namely the parties' primary home, their vacation home, his boat, or their childrens' educational savings accounts.  (Appellant's Brief at 9.)

{¶ 24}  In a divorce proceeding, the domestic court has broad discretion to make divisions of property.  *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 401 (1988).  Its decision will not be reversed unless there has been an abuse of discretion.  *Id.* at 403; *Taylor v. Taylor*, 10th Dist. No. 17AP-763, 2018-Ohio-2530, ¶ 5.  A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner.  *Chawla v. Chawla*, 10th Dist. No. 13AP-399, 2014-Ohio-1188, ¶ 12, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).  Conversely, there is no abuse of discretion where there is some competent, credible evidence supporting the trial court's decision.  *Id.*, citing *Ross v. Ross*, 64 Ohio St.2d 203 (1980); *Hood v. Hood*, 10th Dist. No. 10AP-999, 2011-Ohio-3704, ¶ 14. When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Blakemore* at 219.

### 1.  The trial court sufficiently incorporated Exhibit 1 into the decree.

{¶ 25}  As a preliminary matter, we must determine what constitutes the "decree" entered by the trial court.  William contends that the trial court failed to divide and allocate all of the marital assets because the court "never specifically incorporated into the decree" the spreadsheet titled "Statement of Assets & Liabilities" and labeled "Exhibit 1."

(Appellant's Brief at 9.) That spreadsheet, filed contemporaneously with the decree, provides a list of the parties' assets, a valuation of the assets, whether the asset is marital property or separate property, and a proposed division of the asset or values for the asset assigned to either William or Chloe. (*See* April 26, 2018 Ex. No. 1.) It is similar to the balance sheet the parties prepared and filed as part of their November 6, 2017 stipulations except that it fills in additional figures representing valuations and division of assets that were not stipulated. The trial court did not explicitly state in its decree that it was incorporating the spreadsheet. William's argument, however, is unavailing because the trial court adequately incorporated the exhibit into the decree through its many references to it, and it exists in the record, having been filed contemporaneously with the decree.

{¶ 26} We agree that the better practice would have been for the trial court to include express language that it was incorporating the balance sheet, attached as exhibit 1, into its decree and that the balance sheet addressed all assets, including those not specifically addressed elsewhere in the decree. Nonetheless, the trial court referred to the exhibit multiple times in its decision and directed that certain figures be reflected on the balance sheet in its decision. This was sufficient to incorporate the exhibit into the decree.

{¶ 27} The decree includes language stating expressly that the court adopts the parties' November 6, 2017 stipulations and incorporates them. (Decree at 2.) In its verbatim recitation of the parties' stipulations, the court includes the parties' language that "[t]he values of the parties' assets and debts are as set forth on the balance sheet that is attached as Exhibit 1." (Decree at 2.) Although that language comes from the parties' stipulated exhibit 1, the court's exhibit 1 reflects the parties' stipulations and then expands upon that spreadsheet to address the contested issues. When a divorce decree incorporates a parties' written agreement, like the stipulations here, we apply normal rules of contract interpretation and give effect to the parties' intent. *See Robins v. Robins*, 10th Dist. No. 04AP-1152, 2005-Ohio-4969, ¶ 14-15. The parties' stipulations clearly reference exhibit 1 and " 'clearly communicate that the purpose of the reference is to incorporate the referenced material' " into the stipulations. *See Volovetz v. Tremco Barrier Solutions, Inc.*, 10th Dist. No. 15AP-1056, 2016-Ohio-7707, ¶ 27, quoting *Northrop Grumman Information Technology, Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir.2008). As such, the parties' stipulations are fully encompassed within the court's exhibit 1, and the court's

reference to "Exhibit 1" can be read as a reference to the court's exhibit 1, filed with the decree.

{¶ 28} The court also references its exhibit 1 numerous times as part of its division of the contested assets. In the trial court's analysis of IBF, Ltd., the court stated IBF, Ltd. "shall be reflected on the marital balance sheet as $156,071.00 marital and $312,201.00 as Plaintiff's separate property." (Decree at 8.) The court's exhibit 1 reflects that. (Ex. No. 1, Line 51.) On page 10 of the decree, the court ordered that IBF, Inc. "be reflected on the marital balance of $146,184 as separate property to Plaintiff and $87,710.00 as property of the marriage." The court's exhibit 1 reflects that order. (Ex. No. 1, Line 53.) Similarly, the decree orders that Chloe's trust "be reflected on the marital balance sheet," which aligns with the court's exhibit 1. (*Compare* Decree at 12 *with* Ex. No. 1, Line 50.) On page 14, certain accounts are found to be marital and ordered to be "reflected on the marital balance sheet." Then, regarding division of the contested assets, the court refers specifically to exhibit 1 seven times, directing attention to those portions in exhibit 1 where the court's decision has been memorialized on the spreadsheet. (*See* Decree at 14-15, e.g. "(*Compare* Court Ex. No. 1, Line 51.)".) By referencing the court's own prepared exhibit 1 at least 12 times, the trial court sufficiently incorporated the exhibit into the decree.

### 2. The court failed to completely divide all marital property.

{¶ 29} Having determined that the trial court sufficiently incorporated its April 26, 2018 exhibit 1 into the decree, we next consider whether the decree fully addresses division of the parties' marital assets. We find that it did not.

{¶ 30} R.C. 3105.171(B) mandates that the "the court shall * * * determine what constitutes marital property and what constitutes separate property" in divorce proceedings. As we have recognized, this mandate requires that the trial court "value and divide *all* marital property in a divorce." (Emphasis sic.) *Hackman v. Hackman*, 10th Dist. No. 08AP-516, 2009-Ohio-820, ¶ 23, citing *Beagle v. Beagle*, 10th Dist. No. 07AP-494, 2008-Ohio-764, ¶ 41. The court's failure to divide all marital property "amounts to an abuse of discretion." *Id.*, citing *Beagle* at ¶ 41 ("As a general rule, a trial court's failure to value the marital property constitutes an abuse of discretion."); *Robinson v. Robinson*, 2d Dist. Montgomery App. No. 17562, 1999 Ohio App. LEXIS 5663, *19-20 (Dec. 3, 1999) ("It is an abuse of discretion for a court to fail to divide marital property as required by R.C.

3105.171. * * * R.C. 3105.171 requires a trial court to equitably divide *all* marital assets." (emphasis sic)); *Ray v. Ray*, 9th Dist. No. 03CA0026-M, 2003-Ohio-6323, ¶ 15 (trial court abused its discretion when it valued the wife's interest in a race horse and found that the interest was marital property, but it did not divide that interest between the husband and wife).

{¶ 31} Here, the decree does not fully divide and allocate all of the marital assets. First, there is nothing in the decree or exhibit 1 that addresses disposition of the marital residence. The decree merely states that "the value of the residence shall be the purchase price upon sale." (Decree at 2.) There is nothing in the decree that requires a sale of the property, specifies how a sale is to be handled, addresses what to do if the property does not sell, sets forth how and by whom the property will be maintained until it is sold, or specifies how the proceeds from a property sale should be distributed depending on the final sale price. If the property is not listed to be sold, it is not clear that there is any order that can be enforced to require its sale or to require either party to transfer his or her interest in the property to the other spouse. Plainly, the decree fails to adequately divide the marital residence.

{¶ 32} Likewise, the decree does not adequately address division of the parties' condominium. From exhibit 1, it appears as though the trial court found that the property was a marital asset and determined a fair market value for the condominium. It further appears that the court attempted to divide the property and award its value to William in the "proposed division" column of exhibit 1. (Ex. No. 1 at 1.) But the decree does not fully dispose of the asset. It does not require that William pay any value to Chloe to represent her share of the property or require her to execute documents to transfer her ownership interest in the condominium to William.

{¶ 33} Similarly, with respect to their children's educational accounts, the division of those assets is unclear. The fact that the record reflects that parties felt the need to execute an agreed entry after the decree was issued to stipulate to the distribution of such assets is a clear indicator that the trial court failed to fully divide the parties' marital assets.

{¶ 34} Because the trial court failed to fully divide the parties' marital assets, we sustain William's first assignment of error. We remand this matter to the trial court to fully divide and allocate the parties' marital property.

**B. The trial court did not abuse its discretion in its calculation of the value of the marital interest in Investment Builders of Florida, Ltd. and Investment Builders of Florida, Inc. (Assignment of Error 2).**

{¶ 35} William contends that the trial court erred in its valuation of the marital interest in IBF, Ltd. and IBF, Inc. by failing to trace the marital dollar investments expended for those interests in violation of R.C. 3105.171. Specifically, William argues that the court should have only considered the amount the parties expended to acquire the marital shares in the entities instead of looking at the present value of the shares. William also argues that the trial court calculated the passive appreciation for the two entities improperly such that the court awarded passive appreciation of William's separate shares to Chloe.

{¶ 36} In *Hood v. Hood*, 10th Dist. No. 09AP-764, 2010-Ohio-3618, ¶ 13, this court set forth the standard for reviewing property divisions in domestic relations cases:

> A domestic court has broad discretion to make divisions of property. *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 401 [(1998)], citing *Berish v. Berish* (1982), 69 Ohio St.2d 318. In divorce proceedings, the trial court must classify property as marital or separate property, determine the value of the property, and divide the marital and separate property equitably between the spouses. R.C. 3105.171(B); *Roberts v. Roberts*, 10th Dist. No. 08AP-27, 2008-Ohio-6121, ¶16. We review a trial court's classification of property as marital or separate under a manifest weight of the evidence standard and will affirm if some competent, credible evidence supports the classification. *Taub v. Taub*, 10th Dist. No. 08AP-750, 2009-Ohio-2762, ¶ 15. We will uphold a trial court's valuation and division of property absent an abuse of discretion. *Roberts* at ¶ 16; *Middendorf* at 401. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. If there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion. *Middendorf* at 401, citing *Ross v. Ross* (1980), 64 Ohio St.2d 203.

{¶ 37} The classification of property as marital or separate is governed by statute. *See* R.C. 3105.171. "Marital property" includes "[a]ll real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage" and "[a]ll interest that either or both of the

spouses currently has in any real or personal property * * * and that was acquired by either or both of the spouses during the marriage."  R.C. 3105.171(A)(3)(a)(i) and (ii).

{¶ 38}  By contrast, "separate property" includes "[a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage."  R.C. 3105.171(A)(6)(a)(ii).  R.C. 3105.171(A)(6)(a)(iii) includes in its definition of separate property "[p]assive income and appreciation acquired from separate property by one spouse during the marriage."  The statute further provides:

> (b) The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable.

R.C. 3105.171(A)(6)(b).

{¶ 39}  In *Hood*, 2010-Ohio-3618, we outlined the burden of proof applicable to the classification of marital versus separate property:

> A party requesting that an asset be classified as separate property bears the burden of tracing that asset to his or her separate property.  *Dunham v. Dunham*, 171 Ohio App.3d 147, 2007-Ohio-1167, ¶ 20, 26.  When parties contest whether an asset is marital or separate property, there is a presumption that the asset is marital property, unless proven otherwise.  *Miller v. Miller*, 7th Dist. No. 08 JE 26, 2009-Ohio-3330, ¶ 20.  An appellate court's job is not to reweigh the evidence but to determine whether there was competent, credible evidence to support the trial court's findings. *Dunham* at ¶ 27.

*Hood,* 2010-Ohio-3618, at ¶ 15.  Thus, William bears the burden of overcoming the presumption for marital property and proving the contested asset or interest is traceable to his separate property.

{¶ 40}  "R.C. 3105.171 expresses no specific way for the trial court to determine valuation."  *Banchefsky v. Banchefsky*, 10th Dist. No. 09AP-1011, 2010-Ohio-4267, ¶ 43, citing *Focke v. Focke*, 83 Ohio App.3d 552, 554 (10th Dist.1992).  Likewise, " 'Ohio courts have not specified that only one method of valuation is appropriate when dividing marital property.' "  *Kuper v. Halbach*, 10th Dist. No. 09AP-899, 2010-Ohio-3020, ¶ 12, quoting *Herrmann v. Herrmann*, 12th Dist. Butler No. CA99-01-006, 2000 Ohio App. LEXIS 5146 (Nov. 6, 2000).  "A trial court, in valuing a marital asset, is neither required to use a particular valuation method nor precluded from using any method."  *Clymer v. Clymer*,

10th Dist. Franklin No. 99AP-924, 2000 Ohio App. LEXIS 4248, *10 (Sept. 21, 2000) (identifying five different potential methods for valuation of the goodwill of a law practice in determining its value in divorce proceedings). An appellate court will uphold " 'a trial court's determination of valuation which is based upon competent, credible evidence absent a showing of an abuse of discretion.' " *Banchefsky* at ¶ 43, quoting *Moro v. Moro*, 68 Ohio App.3d 630, 637 (8th Dist.1990).

{¶ 41} Here, the parties ultimately did not dispute the number of shares in the entities that are marital versus separate. Nor did the parties dispute the overall fair market value of IBF, Ltd. and IBF, Inc. at the time of the trial. They disputed only the value of the ownership interest that constituted marital property.

{¶ 42} The parties' marital property interest in IBF, Ltd. was 13.075 percent. The fair market value of IBF, Ltd. was $1,193,658. (Tr. at 551, 652.) The parties spent $30,150 to acquire the marital property interest in IBF, Ltd. The evidence adduced at the trial showed that this figure was less than the amount the parties were originally obligated to pay for the shares. William and Chloe acquired the shares from William's mother. They agreed to pay William's mother $112,500 for the shares and executed a promissory note memorializing the agreement. William's mother forgave the note early.

{¶ 43} William's expert, Gary Moll, testified that he valued the marital property interest in IBF, Ltd. based upon the amount of money the parties actually spent to acquire the shares. He attempted to trace the portion of IBF, Ltd. that became marital property by comparing the change in ownership percentages over time to the value of the underlying entity. (Tr. at 544-45.) He awarded some passive appreciation to the marital shares, concluding that they should be valued at $37,227. (Tr. at 545-46, 552.) He did not explain how he arrived at the amount of passive appreciation he attributed to the marital property.

{¶ 44} Chloe's expert, Dana Lavelle, opined that the marital property comprising 13.075 percent of the IBF, Ltd. business was worth $156,071.[2] (Tr. at 650, 652-54.) To

---

[2] Lavelle provided two potential values for the marital shares, depending on whether the court found that all of the shares acquired during the marriage were marital property. First, he looked at the number of shares actually purchased with the $30,150 expended before the remainder of the note was forgiven. That amounted to 3.5041 percent of the total shares. (Tr. at 651-52.) Then he considered the number of shares sought to be acquired under the note, 13.075 percent. He opined that the shares comprising 3.5041 percent of the business were worth $41,827; the shares comprising 13.075 percent of the business were worth $156,071. (Tr. at 650, 652-54.)

reach this figure, Lavelle multiplied the total fair market value of IBF, Inc. by the percentage of ownership comprising the marital property.

{¶ 45} The parties held 30 shares, out of 200, in IBF, Inc. as marital property. William and Chloe spent $11,500 to acquire those 30 shares. (Tr. at 554.) The parties did not dispute that the fair market value of IBF, Inc. was $584,734.

{¶ 46} William's expert admitted that parties paid less than the shares were worth to acquire them. For example, he stated with respect to the first five shares the parties acquired that "[t]he marital estate only was out $4,000 to get these five shares of stock, even though the prorata value of these shares was 11,855." (Tr. at 556.) When the trial court specifically asked Moll whether the "shares themself [were] worth significantly more than the purchase price," he responded "yes." (Tr. at 558.) Nonetheless, Moll believed that his job was only to consider the impact the original investment decision had on the marital estate, not the value of the asset the estate actually received. He awarded some passive appreciation to the shares, concluding that they should be valued at approximately $15,940. Again, Moll did not explain how he arrived at this figure. Chloe's expert opined that the shares were worth $87,710 using the methodology describe previously. (Tr. at 654-55.)

{¶ 47} The trial court considered both experts' testimony. It rejected Moll's cost-based approach because the transaction under which the parties acquired the shares in IBF, Ltd. was familial, versus arm's length, resulting in the parties paying less for the shares than they were worth. The court also found a cost-based approach to value business shares inappropriate where the transaction occurred "roughly eleven years prior to the divorce." (Decree at 7.) Likewise, with IBF, Inc., the evidence showed that the parties acquired the shares through a familial transaction and at a cost that was far less than the shares were worth. (Decree at 9-10.)

{¶ 48} William provides no law to support his argument that the court should look to the reduced costs the parties paid to acquire the shares versus the present fair market value of the shares. He provides no law that suggests that the court could not accept a value-based analysis. It is William's burden to show the amount of passive appreciation that could be traced to his separate shares. He failed to present sufficient evidence from which the court could trace his requested passive appreciation. The trial court was in the position of evaluating two competing experts' valuations of the shares based upon different

valuation methods. After sufficiently considering the relevant testimony, and based upon a reasoned analysis, the trial court adopted Chloe's expert's valuation method. Chloe's expert provided competent, credible evidence to support his opinion about the value of the marital interest in the two businesses. This is not an abuse of discretion. William's second assignment of error is overruled.

### C. The trial court did not abuse its discretion by ordering that only losses after July 19, 2017 reduce each party's share of the estate (Assignment of Error 3).

{¶ 49} In this assignment of error, William argues that the trial court erred in "ordering that only 'losses' after July 19, 2017 would reduce each party's share of marital accounts."[3] In its decree, after resolving issues related to the parties' separate trust accounts, the trial court states: "All accounts set forth above shall be split effective as of July 19, 2017 and each party shall be awarded any gains and/or losses from date of division to date of distribution of their respective portions."[4] (Decree at 15.) The accounts referenced before the trial court's quoted language are the CRS Trust account and the WES Trust accounts, which include the WES Traditional IRA Vanguard account, the WES Simple IRA Vanguard account, the WES Trust Brokerage account, and the WES Trust Vanguard account. (Decree at 14-15.)

{¶ 50} William argues that the trial court failed to consider the expenses William paid during the pendency of the divorce proceedings. He argues that he used marital funds to pay marital expenses, including Chloe's attorney fees and the parties' mortgage, from the time he filed the complaint to the time the court issued the decree. He contends that these expenditures must be taken into consideration in dividing the marital assets.

{¶ 51} R.C. 3105.171(B) directs the court to "divide marital and separate property equitably." The statute contemplates that the division "shall be equal" unless equal division

---

[3] William does not explain what part of the trial court's decision this assignment of error references, although purports to cite to page 15 of the decree. As noted in fn. 4, that citation is not accurate. The trial court referred to losses three times in its decree. The first two instances, however, were portions of the decree in which the trial court included verbatim language copied directly from the parties' stipulations. As such, any error with this copied language would be invited error. *See generally Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 313 (1987). We focus on the third instance in which the trial court used language about "losses." (*See* Decree at 3, 4, and 15.)

[4] William misquotes this language when he contends the trial court said "'as to the marital assets each party shall be awarded any gains or losses from the date of division to the date of distribution on their respective portions.'" (Appellant's Brief at 15, misquoting Decree at 15.)

would be inequitable.  R.C. 3105.171(C)(1).  Thus, "[t]he trial court is not required to make an equal division of the marital estate, so long as the division is equitable."  *Hadinger v. Hadinger*, 10th Dist. No. 15AP-09, 2016-Ohio-821, ¶ 15, citing *Cherry v. Cherry*, 66 Ohio St.2d 348 (1981), paragraphs one and two of the syllabus.  As stated, a trial court's decision on the equitable division of marital property, including marital debts and liabilities, is subject to an abuse of discretion standard of review.  *Richardson v. Richardson*, 10th Dist. No. 01AP-1236, 2002-Ohio-4390, ¶ 47, citing *Martin v. Martin*, 18 Ohio St.3d 292, 294-95 (1985).

{¶ 52}  William does not argue that funds from any of the above trust accounts were used to pay marital expenses during the pendency of the divorce action.  Nor does he explain how the court's above language otherwise relates to his argument that the court failed to consider expenditures he made during the pendency of divorce proceedings. William also has not supported his argument under this assignment of error with any case law.  As William has raised this assignment of error, he bears the burden of demonstrating in the record how the trial court's decision was unreasonable, arbitrary, or unconscionable. *See generally Richardson* at ¶ 51 ("Without specific evidence supporting appellant's contention that the division of property was unequal, the trial court's judgment cannot constitute an abuse of discretion."), citing *Jackson v. Jackson*, 137 Ohio App.3d 783, 803 (2d Dist.2000).  He has not met that burden.  William's third assignment of error is overruled.

## D. The trial court did not abuse its discretion in its spousal support award (Assignment of Error 4).

{¶ 53} Finally, William argues that the trial court abused its discretion when it awarded Chloe spousal support in the amount of $11,000 per month.  Specifically, William argues that the court improperly failed to consider Chloe's earning capacity and her voluntary unemployment.  William also contends that the court improperly imputed support for J.S. in its award.

{¶ 54} "A trial court has broad discretion in determining whether to award spousal support."  *Havanec v. Havanec*, 10th Dist. No. 08AP-465, 2008-Ohio-6966, ¶ 23, citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 24 (1990) and *Vanderpool v. Vanderpool*, 118 Ohio App.3d 876, 879 (9th Dist.1997).  The amount of a support award also remains within the discretion of the trial court.  *Id.*, citing *Moore v. Moore*, 83 Ohio App.3d 75, 78 (9th

Dist.1992). "[T]he decision to impute income for purposes of spousal support is also within the discretion of the trial court." *Id.*, citing *Nichols v. Nichols*, 9th Dist. Summit No. 19308, 1999 Ohio App. LEXIS 6284 (Dec. 29, 1999) and *Petrusch v. Petrusch*, 2d Dist. Montgomery No. 15960, 1997 Ohio App. LEXIS 823 (Mar. 7, 1997). As such, an appellate court will not reverse a trial court's determination as to spousal support absent an abuse of discretion. *Id.*, citing *Blakemore* at 219; *Leimbach v. Leimbach*, 10th Dist. No. 09AP-509, 2009-Ohio-6991, ¶ 20, citing *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67 (1990); *Alexander v. Alexander*, 10th Dist. No. 09AP-262, 2009-Ohio-5856, ¶ 31; *Wood v. Wood*, 10th Dist. No. 10AP-513, 2011-Ohio-679, ¶ 22. "Courts of appeals apply the 'some competent, credible evidence' standard to attacks on the factual findings underlying a support order in order to determine whether the trial court abused its discretion in its award of support." *Wood* at ¶ 28; citing *Ostmann v. Ostmann*, 168 Ohio App.3d 59, 2006-Ohio-3617, ¶ 48 (9th Dist.); *see also Middendorf v. Middendorf*, 82 Ohio St.3d 397, 401 (1998) ("If there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion.").

{¶ 55} R.C. 3105.18 governs awards for spousal support. It allows the court to award "reasonable" support "for sustenance and for support." R.C. 3105.18(A), (B). In determining whether spousal support is "appropriate and reasonable," and in determining the amount, terms, and duration of the support, R.C. 3105.18(C)(1) lists 14 factors for the court to consider:

> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;
>
> (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

{¶ 56} The trial court must consider all of these factors, "and must not base its determination upon any one of the factors taken in isolation." *Kaechele v. Kaechele*, 35 Ohio St.3d 93 (1988), paragraph one of the syllabus. Furthermore, "[t]he trial court must indicate the basis for its spousal support award in sufficient detail to enable us to determine that the award is fair, equitable and in accordance with the law." *Kaechele* at paragraph two of the syllabus. *See also Leimbach* at ¶ 20.

{¶ 57} Thus, R.C. 3105.18(C)(1) expressly requires that the trial court consider the "relative earning abilities of the parties" and the "relative extent of education of the parties." Earning ability involves "both the amount of money one is capable of earning by his or her qualifications, as well as his or her ability to obtain such employment." (Internal quotations and citations omitted.) *Havanec* at ¶ 8. When considering the relative earning abilities of the parties in connection with an award of spousal support, Ohio courts do not restrict their inquiry to the amount of money actually earned; they may also hold a person accountable

for the amount of money a " 'person could earn if he made the effort.' " *Havanec* at ¶ 8, quoting *Beekman v. Beekman*, 10th Dist. Franklin No. 90AP-780, 1991 Ohio App. LEXIS 3917, *15 (Aug. 15, 1991); *see also Wilkinson v. Wilkinson*, 10th Dist. No. 13AP-73, 2013-Ohio-3627, ¶ 5. "Because R.C. 3105.18(C) permits inquiry into a party's earning potential, Ohio courts often impute income to parties who are voluntarily underemployed or otherwise not working up to their full earning potential." *Havanec* at ¶ 9. "[T]he decision to impute income for purposes of spousal support is also within the discretion of the trial court." *Havanec* at ¶ 23; *see also Rodehaver v. Rodehaver*, 10th Dist. No. 08AP-590, 2009-Ohio-329, ¶ 14.

{¶ 58} Here, the trial court was presented with testimony that Chloe is currently qualified to work as a medical assistant but is not working at all. The court reviewed the evidence and determined that Chloe could work, even full time, when J.S. is eligible for full time adult daycare. Given this, the court implicitly found that Chloe is voluntarily unemployed by imputing an income to Chloe of $38,000 per year, a medical assistant's salary. William's own expert provided the testimony the court used in imputing to Chloe a medical assistant's salary, in considering market demands for medical professionals, and in considering the steps Chloe would have to take to become licensed again. The trial court's determination that Chloe can work full time as a medical assistant was supported by competent, credible evidence.

{¶ 59} It also was not an abuse of discretion to decline to impute an income to Chloe representing a job she is currently unqualified to perform. In rejecting William's request that she be imputed an income for a nurse practitioner, the court expressed concern about Chloe's ability to regain her nurse practitioner license quickly and easily after 26 years out of the workforce. Specifically, the court found that Chloe's license lapsed in 2008; she became a stay-at-home mom in 1995; and she "has not been in practice for over 20 years and would have to pass a national certification exam" to regain her license. (Decree at 16-17.) There is no certainty, in fact the trial court expressed doubt, that Chloe can complete the steps necessary to regain her license. Pursuant to R.C. 3105.18(C)(1)(k), it was proper for the court to consider the "time and expense necessary" for Chloe to acquire "education, training, or job experience." Thus, contrary to William's argument, the trial court did consider her education and earning capacity, including barriers to that earning capacity,

and chose to attribute to her a salary representing a job she is presently qualified for instead of a job that she needs to become licensed to perform. *See* R.C. 3105.18(C)(1)(b), (h), and (k).

{¶ 60} Similarly, William's argument that the trial court improperly imputed support for J.S. in its spousal support award is unpersuasive. Although the trial court discussed J.S., it did not award spousal support that included support for J.S. Rather, the discussion about J.S. centered around his impact on Chloe's employability. The court rejected Chloe's contention that employment outside the home is infeasible because of J.S. Rather, the court specifically stated: "the Court is of the opinion that full-time adult daycare [for J.S.] would allow [Chloe] the opportunity for full time employment." (Decree at 21.) As such, the court imputed to Chloe an annual income of $38,000 per year, the salary of a full time medical assistant. There is nothing in the decree that suggests that the trial court's spousal support award was affected by considerations for J.S.'s care.

{¶ 61} The decree also shows that the court fulfilled its obligation to consider the other factors listed in R.C. 3105.18(C)(1). The trial court considered the "lost income production capacity," R.C. 3105.18(C)(1)(m), from Chloe's decision to leave the workforce and tend to marital and familial responsibilities. (Decree at 17.) The trial court also considered Chloe's health, her education, and her experience in its analysis. (*Compare* Decree at 16-17 *with* R.C. 3105.18(C)(1)(c).) It considered Chloe's age, 57 years old, that the parties' marriage lasted more than 25 years, and that the parties have significant retirement benefits. (*Compare* Decree at 16 *with* R.C. 3105.18(C)(1)(c) through (e).) It considered the parties' lifestyle, assets, and liabilities. (*Compare* Decree at 16 *with* R.C. 3105.18(C)(1)(g), (i).) The court even considered the tax treatment of awarding spousal support, pursuant to R.C. 3105.18(C)(1)(l). (Decree at 17.) The court "retained jurisdiction for the modification of spousal support" should Chloe become recertified as a nurse practitioner. (Decree at 21.) The court's analysis on this issue was comprehensive and there is no evidence that the court abused its discretion.

### 1. The trial court did not abuse its discretion in reserving jurisdiction to modify its award of spousal support.

{¶ 62} In this fourth assignment of error, William also argues that the trial court "improperly limit[ed] the change in circumstances that would support a modification of spousal support." (Appellant's Brief at 20.) According to William, the trial court limited its

own jurisdiction to modify the spousal support award only if Chloe chooses to regain her nurse practitioner certification.  William contends that this conflicts with case law that allows for a substantial change in circumstances to support the modification of a spousal support award.

{¶ 63}  William supports his argument by focusing on the language in the decree in which the trial court states: "should the Defendant choose to obtain her recertification as a Nurse Practitioner, the Court has retained jurisdiction for the modification of the spousal support obligation."  (Decree at 21.)  But that is not the only language in the decree regarding the trial court's continuing jurisdiction over spousal support.  In the very next paragraph, the trial court states:

> Said spousal support obligation shall terminate upon the death of either party, remarriage of Defendant, or Defendant's cohabitation with an unrelated adult.  This Court retains jurisdiction for modification of this provision.

(Decree at 21.)

{¶ 64}  R.C. 3105.18(E)(1) addresses a trial court's retention of jurisdiction over a spousal support award:

> (E) If * * * a continuing order for periodic payments of money as spousal support is entered in a divorce * * *, the court that enters the decree of divorce * * * does not have jurisdiction to modify the amount or terms of the alimony or spousal support unless the court determines that the circumstances of either party have changed and unless one of the following applies:
>
> (1) In the case of a divorce, the decree * * * contains a provision specifically authorizing the court to modify the amount or terms of alimony or spousal support.

Thus, the express language of the statute and our case law makes it clear that the trial court is not required to retain jurisdiction over a spousal support award.  *See Furman v. Furman*, 10th Dist. No. 10AP-407, 2011-Ohio-6558, ¶ 18, citing R.C. 3105.18(E)(1) (trial court does not retain jurisdiction to modify the amount or term of spousal support unless the court explicitly retains such).  "The decision to retain jurisdiction to modify an award of spousal support is left to the sound discretion of the trial court."  *Id.*, citing *Deacon v. Deacon*, 8th Dist. No. 91609, 2009-Ohio-2491, ¶ 63.

{¶ 65} Here, the trial court expressly retained jurisdiction for the modification of its spousal support award. One circumstance in which modification may be appropriate, as the trial court recognized, is if Chloe obtains recertification as a nurse practitioner. The trial court's broad retention of jurisdiction is not limited to that circumstance, however, and we find no abuse of discretion in the court's broad retention of jurisdiction.

{¶ 66} We overrule William's fourth assignment of error and affirm the trial court's spousal support award and its retention of jurisdiction to modify such award.

## IV. CONCLUSION

{¶ 67} Because the trial court did not fully divide the parties' assets, we sustain William's first assignment of error. We remand this matter to the trial court to enter a decree that fully divides the parties' assets. We overrule William's three other assignments of error. The trial court did not abuse its discretion when it rejected William's expert's valuation of the marital interests in IBF, Ltd. and IBF, Inc. and used a value-based analysis to calculate the value of the marital interests in those entities. William did not show that the trial court's decision was unreasonable, arbitrary, or unconscionable regarding allocation of the parties' "losses." Finally, the court acted within its discretion to award Chloe spousal support in the amount of $11,000 a month after imputing income to Chloe in the amount of $38,000 per year as a medical assistant. Accordingly, we affirm in part and reverse in part the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed in part and reversed in part;*
*remanded with instructions.*

BRUNNER and HANDWORK, JJ., concur.

HANDWORK, J., retired, formerly of the Sixth Appellate
District, assigned to active duty under authority of Ohio
Constitution, Article IV, Section 6(C).

_____